IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JANETTE NADINE DOBBS, | ) | CASE NO. 3:19-CV-2367 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Janette Nadine Dobbs ("Dobbs") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.

As set forth more fully below, the VE's testimony, upon which the ALJ relied, is not substantial evidence supporting the ALJ's determination regarding the jobs and/or the number of jobs that Dobbs could perform in the national economy. As a result, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

Dobbs filed an application for SSI in January 2016, alleging a disability onset date of September 9, 2015. Tr. 175. She alleged disability based on the following: C6 and C7 anterior cervical fusion, three bulging discs in lower back, "something wrong with my hip," sciatica, bulging veins in my lower legs, and spinal stenosis. Tr. 193. After denials by the state agency initially (Tr. 83) and on reconsideration (Tr. 97), Dobbs requested an administrative hearing (Tr.

1

113). A hearing was held before an Administrative Law Judge ("ALJ") on January 25, 2018. Tr. 23-71. In his June 7, 2018, decision, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Dobbs can perform, i.e. she is not disabled. Tr. 25-26. Dobbs requested review of the ALJ's decision by the Appeals Council (Tr. 173) and, on August 21, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Dobbs was born in 1967 and was 48 years old on the date she filed her application. Tr. 24. She completed tenth grade. Tr. 43. She previously worked as a semi-truck driver and last worked in September 2015. Tr. 44-46.

### B. Relevant Medical Evidence[1]

In 2004, Dobbs had cervical spine fusion at C6-C7. Tr. 381, 824.

In February 2015, Dobbs saw Dr. Rohrer, M.D., and reported that she had fallen out of her semi-truck one month earlier, injuring her back. Tr. 821-822. She had sought treatment at the time of her fall and was given Naproxen and Flexeril and told to take off work until mid-February. Tr. 821. She complained to Dr. Rohrer of lumbar pain and radiating right hip pain. Tr. 821. She also reported numbness in her left hand and two fingers. Tr. 825. Dr. Rohrer ordered cervical and lumbar spine x-rays. Tr. 821, 281. The lumbar x-rays showed no acute abnormalities and mild multi-level degenerative disc disease. Tr. 282. Dr. Rohrer prescribed Flexeril and Ultram. Tr. 821, 827. Although Dr. Rohrer initially opined that there was "no

---

[1] Dobbs only challenges the ALJ's decision with respect to her lower back and leg impairments. Thus, the bulk of the medical evidence summarized and discussed herein is related to those impairments.

2

medical reason that [Plaintiff] needs to be off of work," Tr. 742, after Dobb's boyfriend called the office to say that she was in pain and had trouble getting into her truck, Dr. Rohrer advised that Dobbs should take Naprosyn with Ultram and could be of work the "rest of this week." Tr. 744, 745. He referred her to physical therapy. Tr. 317.

Dobbs began physical therapy in February; her initial exam showed a reduced range of motion and tenderness and spasms in her back. Tr. 317-319. She also had slightly limited rotation and abduction in her hips. Tr. 318. The physical therapist opined that her symptoms were consistent with a lower back strain. Tr. 319. At her second physical therapy appointment in March, Dobbs complained of severe pain such that she could not walk without a walker. Tr. 315. The physical therapist observed that her subjective complaints appeared to be "inconsistent with objective measures." Tr. 315.

In March 2015, Dobbs had an MRI of her lumbar spine, which showed degenerative changes, most prominent at facet joints on the right side at the L4-L5 and L5-S1 levels, including articular/periarticular edema compatible with reactive changes from degenerative mechanical stress. Tr. 831-32. An x-ray of the pelvis and right hip showed mild degenerative change of the hip joints bilaterally and mild degenerative changes of the lower lumbar spine. Tr. 830.

On April 3, Dobbs reported to her physical therapist that her leg pain had resolved. Tr. 305. She saw Dr. Rohrer on April 20 and stated that therapy was helping and she was ready to return to work. Tr. 834. Upon exam she had no back tenderness. Tr. 834.

On June 9, 2015, Dobbs was discharged from therapy. Tr. 302. The physical therapist stated that she was "fully functional" with activities of daily living and work activities. Tr. 302.

On September 9, 2015, Dobbs saw Dr. Rohrer and complained about pain in her right leg around the area of a vein. Tr. 836. Upon exam, she had a normal range of motion and no

tenderness in her spine, full strength in her arms and legs, and a normal gait. Tr. 837. Dr. Rohrer sent to her to a vein specialist. Tr. 838.

On September 14, 2015, Dobbs saw vein specialist Dr. Bryant, D.O. Tr. 1041. Dr. Bryant ordered a venous insufficiency study of her right leg. Tr. 1042. The study did not reveal significant issues and Dr. Bryant opined that Dobbs's leg pain was related to her back issues. Tr. 848.

On September 22, Dobbs returned to Dr. Rohrer and reported that Dr. Bryant believed that her pain was coming from her SI joint on the right side or a "nerve issue." Tr. 849. The more she used her leg the more it hurt. Tr. 849. She had not slept well for the last three days due to pain. Tr. 849. Upon exam, she had pain over her right SI joint and piriformis muscle. Tr. 849. Dr. Rohrer prescribed Norco and referred her to physical therapy again. Tr. 849, 329.

On October 16, 2015, Dobbs saw Dr. Rohrer. Tr. 370. She had stopped physical therapy because it was not helping and she wanted to discuss a possible referral to a neurosurgeon. Tr. 370. Upon exam, she had right-sided lumbar pain. Tr. 370. He referred her to Dr. Jacobsen, a neurosurgeon. Tr. 370.

On November 10, 2015, Dobbs saw Dr. Jacobsen, D.O., at the NeuroSpine & Pain Center. Tr. 363. Upon exam, she had full strength in her extremities other than 4/5 strength in her right hip muscles (iliopsoas) with splinting secondary to pain. Deep palpation of the right SI joint elicited a significant amount of pain and she had an upward elevation of the right iliac. She had a hesitant gait secondary to right hip pain, a positive FABER test, and pain with palpation of her right SI joint. Tr. 364. The treatment note summarized her MRI as showing mild degeneration with no significant nerve root compression and flexion/extension lumbar x-rays taken that day did not show significant instability. Tr. 364. Dr. Jacobsen prescribed an SI joint

4

belt, SI joint physical therapy, Medrol Dosepak and muscle relaxants, and a referral to a chiropractor and then an SI joint injection with Dr. Austin. Tr. 364. On November 17, Dobbs started physical therapy. Tr. 407. The therapist commented that Dobbs appeared to be in such pain and distress that the therapist was unable to complete a comprehensive evaluation. Tr. 400-401.

In December 2015, after five visits, Dobbs's physical therapist noted that she was not responding well to physical therapy. Tr. 358, 391. The therapist stated, "I strongly believe that her subjective complaints are not consistent with objective findings." Tr. 358. The therapist also observed that, although Dobbs stated that she experienced severe pain when transferring from different positions, she did so during her therapy without appearing to be in an excruciating amount of pain, "laughing or carrying on a normal conversation." Tr. 391. She was also observed to have ambulated with an exaggerated forward-flexed posture and to have gotten into her vehicle "spontaneously" after treatment without apparent pain or distress. Tr. 389.

On January 11, 2016, Dobbs saw Dr. Austin, M.D., at a pain management clinic complaining of low back and right leg pain. Tr. 416. Upon exam, she had negative straight leg raise testing; a positing positive FABER test, right greater than left; lumbar paraspinal tenderness; facet loading; and an antalgic gait. Tr. 418-419. Dr. Austin diagnosed sacroiliitis, chronic pain disorder, and low back pain with right-sided sciatica and recommended steroid injections and continued physical therapy. Tr. 419. On January 19, Dobbs received a right SI joint injection. Tr. 797.

On April 25, 2016, Dobbs went to the emergency room after she slipped and fell down three steps. Tr. 762. A right hip x-ray showed mild osteoarthritis. Tr. 765. A non-contrast CT

5

of the lumbar spine was unremarkable. Tr. 767. She was given Norflex and Toradol in the emergency room and a prescription for a two-wheeled walker for gait instability. Tr. 762, 1091. Two days later Dobbs followed up with Dr. Rohrer and he prescribed Prednisone, Flexeril and a handicap placard. Tr. 853.

On August 11, 2016, Dobbs saw Dr. Austin, reporting that she'd had 60% relief for one month after the SI joint injection in January. Tr. 1151. Her pain was 10/10. Tr. 1151. Upon exam, she had pain with palpation over her right lumbar facet joints and right SI joint; pain with range of motion of her lumbar spine and right hip; 4/5 strength in her right lower extremity; and an antalgic gait. Tr. 1153. Dr. Austin diagnosed right-sided low back pain with right-sided sciatica, sacroiliitis, chronic pain disorder, fibromyalgia, and myofascial pain. He recommended repeating the right SI joint injection, which he performed that day, and a right S1 and L5 transforaminal epidural steroid injection (TFESI) in the future for radicular symptoms. He recommended rotating ice and heat and using Tylenol and Ibuprofen for pain. He advised her to use her walker at home due to frequent falls. Tr. 1154, 799–800.

A January 2017, Dobbs saw Dr. Young, M.D., at the NeuroSpine and Pain Center for an evaluation of her upper and lower body issues. Tr. 806-807. Upon exam, she had a normal gait and station and full muscle strength in her arms and legs. Tr. 807. Dr. Young reviewed x-rays of her right hip, which he described as normal. Tr. 807. He advised updated x-rays, MRIs and physical therapy. Tr. 807.

Dobbs returned to Dr. Young on February 8, 2017; upon exam, she had a normal gait and station and full muscle strength. Tr. 808. Dr. Young performed a left ulnar nerve decompression surgery on February 10. Tr. 808. On March 27, she had full muscle strength. Tr. 813.

On March 30, 2017, Dr. Young performed a cervical discectomy and fusion; at a follow-up appointment in June, she had full strength in all muscles and a normal gait and station.  Tr. 45, 813, 817.

On October 31, 2017, Dobbs began physical therapy to evaluate and treat her diagnoses of neck pain; spinal stenosis, lumbar region; and lumbar radiculopathy.  Tr. 1017.  After ten appointments, she was discharged on December 22, having only made some improvement: based on her answers to the Oswestry Low Back Pain Disability Questionnaire, she had a 40% impairment upon discharge when her initial score indicated a 68% impairment.  Tr. 1012.

### C. Opinion Evidence—State Agency Reviewing Physicians

On February 19, 2016, state agency reviewing physician Dr. Teague, M.D., reviewed Dobbs's record and opined that she could lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently, could stand and/or walk about six hours, and could sit about six hours.  Tr. 78.  She could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and could frequently balance.  Tr. 79.

On June 20, 2016, state agency reviewing physician Dr. Gallagher, D.O., reviewed Dobbs's record and agreed with Dr. Teague, but also included an additional limitation that Dobbs could only frequently reach overhead with her arms.  Tr. 92–93.

### D. Testimonial Evidence

#### 1. Dobbs's Testimony

Dobbs was represented by counsel and testified at the administrative hearing.  Tr. 34.  Dobbs testified that she lives with a friend in a tri-level house, i.e., a few steps separate the main floor and the floor below, and a flight of stairs leads to the upper floor.  Tr. 38.  Dobbs's bedroom is "downstairs."  Tr. 38.  Her roommate is a truck driver too, and he is away for 5-6

7

days at a time and home for a day or two.  Tr. 41.  She has a driver's license and drives her roommate's car when he is away.  Tr. 42.  She has a handicapped placard for the car that was issued to her in April 2016.  Tr. 41-42.  She drives short distances because her doctor "doesn't want me driving a long distance and if I do, he says he wants me to get out every 30 minutes."  Tr. 42.  She drives about once a week for about 20 minutes because the places she goes aren't far.  Tr. 42-43.

Dobbs stated that she stopped working because the sciatica nerve in her right leg was flaring up as a result of a fall she had while getting out of her semi-truck in early 2015.  Tr. 45-46.  She briefly went back to work but had to stop; it got to where she couldn't walk, her right leg was going numb, and she went to see a doctor.  Tr. 45-47.  Then she had to have surgeries in her neck and arm.  Tr. 45.  And in April 2016, she fell down some steps.  Tr. 45.  At the time of her hearing, her leg still "flares up": "I'll end up getting a bulging vein in my lower right leg."  Tr. 47.  This is caused by her sciatica and the pain is a burning, stabbing sensation.  Tr. 47.  It flares up about once a week and last for 20 minutes.  Tr. 61.  When asked if she was currently receiving any treatment for it, Dobbs stated that the doctor was waiting to see if he is going to do back surgery or hip surgery.  Tr. 47.  When asked what the doctor was waiting for, Dobbs explained that the doctor wanted part of her neck to heal up first.  Tr. 47.

Dobbs has gotten injections in her hip; the last one was in April 2016.  Tr. 58.  Her insurance would not approve another until she completed physical therapy, which she had done just prior to the hearing, in December 2017.  Tr. 58.  The physical therapy did not help at all.  Tr. 58.  She has pain in her lower back and hip when she sits for a long period of time and when she tries to get up, she is hunched over for a minute or two.  Tr. 61.

At the hearing, Dobbs had a two-wheeled walker, which she got in April 2016.  Tr. 48-

8

49.  She uses it to get around when her right leg flares up, which is 90% of the time, because then it goes numb and she will fall.  Tr. 49.  She also has a cane, which she uses a couple of times a month.  Tr. 50.  Most of the time she uses the walker.  Tr. 50.  She uses it inside "to get up from the couch and go to the bathroom and stuff" and outside the house.  Tr. 50.  She can sit for about 20 minutes before lying down, stand for about 15 minutes without her walker, and walk for about 5 minutes without her walker.  Tr. 61.  She can lift a gallon of milk; she hasn't tried to lift more than that because her doctor put her on a weight restriction after her neck surgery.  Tr. 61.  She does not do household chores, although she cooks and does laundry.  Tr. 51-53.  She has a small dog that she lets outside in the fenced yard and sometimes she cleans up after it; otherwise her roommate does it when he is home.  Tr. 53.

Dobbs spends about six hours a day sitting or lying on the couch watching television.  Tr. 54.  She goes grocery shopping once a week and uses a motorized cart the store provides.  Tr. 54-55.  Her sleep is "poor"; she gets about 5 hours a night and the pain in her hip, back or neck wakes her up.  Tr. 64.  Two weeks prior to the hearing, Dobbs returned from Mississippi, where she was visiting her mother and her grandchild.  Tr. 55-56.  She drove down with a friend and it took them 8 hours.  Tr. 56.  Her friend did most of the driving and Dobbs did some.  Tr. 56.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 64-70.  The ALJ asked the VE to determine whether a hypothetical individual of Dobbs's age, education and work experience could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform Dobbs's past work but could perform the following jobs with significant numbers in the national economy: checker, routing clerk, and mail sorter.  Tr. 65-66.

9

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his June 7, 2018, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since January 6, 2016, the application date. Tr. 17.

2. The claimant has the following severe impairments: degenerative disc disease of the cervical spine at C4-6, status post surgery. Tr. 17.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 18.

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except, she can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl; and frequently reach overhead with the bilateral upper extremities. However, the claimant may not engage in commercial driving and must avoid concentrated exposure to extreme cold. The claimant can frequently handle and finger with the non-dominant upper left extremity, but requires a two-handed assistive device for ambulation. Tr. 19.

5. The claimant is unable to perform any past relevant work. Tr. 24.

6. The claimant was born in 1967 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age. Tr. 24.

7. The claimant has a limited education and is able to communicate in English. Tr. 24.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

11

8. Transferability of job skills is not an issue because using the Medical-Vocational Rules as a framework supports a finding that the is "not disabled," whether or not the claimant has transferrable job skills. Tr. 24.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 25.

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 6, 2016, the date the application was filed. Tr. 26.

## V. Plaintiff's Arguments

Dobbs argues that the ALJ erred because he failed to find her lumbar degenerative disc disease, sciatica, and sacroiliitis to be medically determinable impairments at step two, and the VE's testimony regarding the kind and number of jobs she could perform is not substantial evidence supporting the ALJ's decision at step five. Doc. 14.

## VI. Law and Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

> **A. Any error the ALJ may have committed at step two is harmless because he considered Dobbs's lower back and leg impairments when formulating his RFC assessment**

Dobbs argues that the ALJ erred when he failed to discuss whether her lumbar disc disease, sciatica (radiculopathy), or sacroiliitis were medically determinable impairments at step two, which flawed his analysis at other steps of the sequential evaluation. Doc. 14, p. 14; Doc. 17, pp. 3-4.

Step two is a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). When an ALJ finds both severe and non-severe impairments at step two and continues with subsequent steps in the sequential evaluation process, error, if any, at step two may not warrant reversal. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is not reversible error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008); *Hedges v. Comm'r of Soc. Sec.*, 725 Fed. App'x 394, 395 (6th Cir. 2018) ("So whether the ALJ characterized Hedges' mental-health impairments as severe or non-severe at step two is 'legally irrelevant' and does not amount to error.").

While true that the ALJ did not discuss Dobbs's lower back and leg impairments at all at step two, his failure to do so, to the extent it is error, is harmless, because he considered Dobbs's lower back and leg impairments in assessing her RFC. *See Mardis v. Comm'r of Soc. Sec.*, 2019 WL 911087, at *5 (S.D. Oh. Feb. 25, 2019)[3] (the ALJ failed to find back and knee impairments medically determinable impairments at step two; "any error at step two would be harmless because the ALJ did, in fact, consider Plaintiff's knee and back conditions in assessing her

---

[3] *Report and Recommendation adopted*, 2019 WL 2223071 (S.D.Oh. May 23, 2019).

RFC."); *Hedges*, 725 Fed. App'x at 395.  The ALJ thoroughly detailed Dobbs's lower back and leg impairments and considered those impairment when formulating Dobbs's RFC.[4]  Tr. 20-22.  He explained that her 2015 imaging showed mild findings and that she completed physical therapy making her fully functional in her activities of daily living and job activities.  Tr. 21.  The ALJ observed the following: despite complaints of right leg pain and difficulty walking, Dobbs's subsequent exam findings were grossly normal.  Tr. 21.  She was maintained on her medications and derived some benefit from physical therapy and injections.  Tr. 21-22.  Updated imaging did not show material worsening.  Tr. 21.  And the more recent physical exam findings indicated full strength and a normal gait.  Tr. 22.  Dobbs does not challenge the ALJ's characterization of that evidence.  She argues that the ALJ's "passing reference to 'reported improvements in her lower back impairments with epidural steroid injections and physical therapy' does not mend his analysis."  Doc. 14, p. 15. (citing Tr. 24).  However, as described above, the ALJ did not just make a "passing reference" to reported improvement.  And, Dobbs agrees that she showed some improvement.  Doc. 14, pp. 15-16.

Furthermore, the ALJ relied upon the state agency reviewers' opinions when formulating the RFC assessment, giving those opinions "great" weight.  The state agency reviewers, in turn, cited Dobbs's lower back and leg impairments when expressing their opinions about her limitations.  Tr. 78-79, 91-93 (state agency reviewing physicians' opinions citing, in support of exertional and postural limitations, the findings in Dobbs's lumbar MRI and her right hip and pelvis x-ray as well as her physical exam findings of her lower back, extremities and gait in January 2016).  Dobbs argues that the ALJ's reliance upon the state agency reviewing physicians' opinions is misplaced because the reviewing physicians did not have the entire

---

[4] Indeed, the ALJ discussed at greater length Dobbs's lower back and leg impairments than her cervical spine impairment, which he found to be severe.

14

record when they assessed Dobbs's limitations, in January and June 2016. Doc. 14, p. 16. Nevertheless, when an ALJ considers evidence in the record post-dating the state agency reviewers' opinions, it is not error to rely on those opinions. *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. 2009) (the ALJ's reliance upon state agency reviewing physicians' opinions based on outdated evidence was not error when the ALJ considered the evidence that developed after the issuance of those opinions). And it is clear that the ALJ considered the evidence that developed after the issuance of the state agency reviewers' opinions. For instance, the ALJ noted that Dobbs had received some benefit from hip injections in August 2016 (Tr. 22, citing Tr. 1151, 1154) and that she reported her lower back symptoms caused random and transient numbness and tingling in October 2016 (Tr. 22, citing Tr. 860). The ALJ cited record evidence from February and June 2017, wherein Dobbs was found to have full muscle strength in all extremities and a normal gait and station. Tr. 22. Dobbs does not challenge the ALJ's reliance upon any of this evidence. Finally, the state agency reviewers did not find that Dobbs required an assistive device for ambulation, and the ALJ did. Because the ALJ cited and relied upon evidence in the record that post-dates the state agency reviewing physicians' opinions, it was not error for the ALJ to rely on those opinions.

In sum, any error on the part of the ALJ at step two is harmless.

### B. The VE testimony, upon which the ALJ relied, is not substantial evidence supporting the ALJ's determination regarding the jobs Dobbs can perform

Dobbs argues that the VE's testimony regarding jobs she could perform while using a two-handed assistive device for ambulation is not substantial evidence supporting the ALJ's determination that she could perform jobs in significant numbers in the national economy. The Court agrees.

To recap: the ALJ found that Dobbs could perform work at the light exertional level

15

(standing/walking 6 hours, carrying 10 pounds frequently and 20 pounds occasionally) with postural limitations and asked the VE whether such an individual could perform work. Tr. 66. The VE answered that such an individual could perform the following jobs with significant numbers in the national economy: checker (35,000 jobs); routing clerk (43,000 jobs); and mail sorter (55,000 jobs). Tr. 66. The ALJ then asked the VE if his answer would change if the individual required a two-handed assistive device to ambulate, a limitation the ALJ included in his subsequent RFC determination. Tr. 66-67. The VE testified that his answer would not change, i.e., the individual could still perform the type and number of jobs identified above. Tr. 67.

Dobbs argues that she could not perform the jobs the VE identified because an individual cannot carry objects while ambulating using a two-handed assistive device. In support, she cites SSR 96-9P, which provides that an individual who uses an assistive device in one hand may still be able to perform the lifting and carrying requirements of sedentary work, albeit with a reduction in the number of jobs in some instances. Doc. 14, p. 18 (citing SSR-9P, 1996 WL 374185, at *7). Dobbs contends that, taking into account SSR-9P, it stands to reason that an individual using a two-handed assistive device, like Dobbs, would not be able to perform the lifting and carrying requirements of work at the higher, light exertional level, at all or without significant reduction in the number of jobs. Doc. 14, p. 18. In other words, Dobbs asserts that a claimant can still carry items with one hand while ambulating holding a one-handed assistive device (like a cane) in the other hand, but a claimant is unable to carry items in any hand if she is using a two-handed assistive device to ambulate.

Defendant disagrees. Defendant argues that because the VE identified jobs that an individual with the limitations described by the ALJ could perform, the ALJ reasonably relied on

16

that testimony. Doc. 16, p. 12. In support, Defendant cites two cases in which, Defendant asserts, courts upheld the ALJ's reliance upon VE testimony regarding jobs a claimant could perform "despite the need for an assistive device." Doc. 16, pp. 12-13 (citing *Steig v. Comm'r of Soc. Sec.*, 2019 WL 2118794, at * 7 (W.D. Mich. May 15, 2019) and *Scott v. Comm'r of Soc. Sec.*, 2015 WL 4634077, at *6 (E.D. Mich. July 6, 2015)). However, in both *Steig* and *Scott* the issue was whether VE testimony supported the ALJ's finding that the individual could perform jobs in substantial numbers when the hypothetical question presented to the VE included a limitation that the claimant required a one-handed assistive device while performing light work, not a two-handed assistive device. It is apparent that a claimant may carry an object with one hand while using an assistive device with the other hand. *See, e.g., Bates v. Comm'r of Soc. Sec.*, 2016 WL 4607566, at *3 (W.D. Mich. Sept. 6, 2016) ("[T]he Court discerns no reason why Plaintiff cannot use a cane with one hand while carrying objects with the other."); *Frazier v. Comm'r of Soc. Sec.*, 2020 WL 1856202, at *9 (E.D. Mich. Mar. 11, 2020).[5] However, it is not apparent that a claimant may carry an object when both hands are on a two-handed assistive device. *See, e.g., Sharp v. Comm'r of Soc. Sec.*, 2019 WL 4281976, at *20 (E.D. Mich. May 2, 2019) (reversing the ALJ's decision in part because the ALJ did not specify in the hypothetical to the VE whether the claimant needed a one- or two-handed assistive device, finding the difference material; "if a claimant needs two hands on her assistive device, how is she able to occasionally lift or carry objects, stoop, crouch, kneel, and crawl?").[6] Thus, the ALJ's step five determination is not supported by substantial evidence.

Because the ALJ's step five determination is not supported by substantial evidence, the

---

[5] *Report and recommendation adopted*, 2020 WL 1847923 (E.D. Mich. Apr. 13, 2020).

[6] *Report and recommendation adopted*, 2019 WL 4278510 (E.D. Mich. Sept. 10, 2019).

17

Commissioner's decision must be reversed. *See id*., at *21.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED and REMANDED** for further proceedings consistent with this opinion.[7]

IT IS SO ORDERED.

Dated: October 13, 2020

/s/*Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

---

[7] This opinion should not be construed as a recommendation that, on remand, Dobbs be found disabled.